**LaSHAWN A., et al., Plaintiffs,**

v.

**Sharon Pratt KELLY, et al., Defendants.**

**Civ. No. 89–1754 (TFH).**

United States District Court,
District of Columbia.

May 22, 1995.

Marcia Robinson Levy, Christopher Dunn, Craig Levine, American Civ. Liberties Union Foundation, New York City, for plaintiffs.

Anna Blackburne, Asst. Corporate Counsel, Office of Corp. Counsel, Washington, DC, for defendants.

### MEMORANDUM OPINION

THOMAS F. HOGAN, District Judge.

Four years ago, this Court heard more than two weeks of testimony and accepted more than 1000 admissions in a trial which exposed the desperate condition of the District of Columbia child welfare system. The Court then issued a 102–page opinion reaching "[t]he inescapable conclusion" that the system was operated in violation of federal law, District law, and the United States Constitution.[1]

Once the Court entered this finding of liability, the parties and court-appointed

---

1. *LaShawn A. v. Dixon,* 762 F.Supp. 959, 960–61 (D.D.C.1991).

Monitor worked before a backdrop of further legal proceedings to plan and implement reforms which would alleviate the violations. Four years and two mayoral administrations later, however, many if not most of the problems remain. Children are routinely denied the protections and services that local and federal law require. Because all reasonable alternative measures of change have been exhausted, the Court today grants the plaintiffs' motion for contempt and imposition of a full receivership.

## I. PROCEDURAL HISTORY

This case began with the filing of a class action on behalf of abused and neglected children in the District of Columbia, including both children within the District's custody and those who remained in private custody but were known to the District's Department of Human Services (DHS). Several District of Columbia officials, including the mayor, were named in their official capacities.[2] After a bench trial in February 1991, the Court issued a Memorandum Opinion on April 18, 1991.

The opinion detailed widespread problems within the District of Columbia child welfare system and held that the defendants operated the system in a manner that violated the federal and local statutory rights of all the children in the plaintiff class. The Court also held that the defendants violated the Fifth Amendment rights of those plaintiff children in the foster care custody of the District of Columbia.

After the finding of liability, the parties worked together to plan a course of remedial action. After a few months, the plaintiffs and defendants reached agreement on the specifics of needed reform. On August 27, 1991, the Court granted the parties' joint motion for entry into judgment of a Remedial Order incorporating this agreement. The Court then adopted the Monitor's Implementation Plan which laid out the steps necessary to comply with the Remedial Order. The defendants, in accordance with the terms of the Remedial Order, then appealed the judgment of liability, arguing alternatively that the Court erred in finding federal statutory and constitutional liability and that the Court should have abstained from exercising jurisdiction because the plaintiffs' claims were more appropriately addressed by the District of Columbia courts.

On October 1, 1993, the Court of Appeals issued a remand, concluding that

> Because the district court's judgment is independently supportable by District of Columbia law, we affirm the court's decision in favor of the children in this case. It appears that each provision of the remedial order reflects the requirements of District of Columbia statutes and regulations, as well as of federal statutes. Nevertheless, because the order was drafted to conform with federal as well as with District law, there are scattered references in the order to federal law that are inappropriate in light of our confirmation of the decision entirely on the basis of local law.

> We therefore remand to the district court, with instructions to fashion an equally comprehensive order based entirely on District of Columbia law, if possible. If there are any portions of the consent decree that depend entirely on a federal statute, the district court should consider the impact of *Suter v. Artist M.* on those provisions before it includes them in the revised consent decree.[3]

After reviewing the parties' briefs and hearing arguments on necessary modifications, the Court issued a second Remedial Order on January 27, 1994, which incorporated the minor changes requested by the Court of Appeals. The Monitor thereafter developed a Revised Implementation Plan, which the

---

2. The heads of each of the agencies in the chain of supervision for the child welfare system were named. The Child and Family Services Division (CFSD) is primarily responsible for the child welfare system. The CFSD is a subunit of the Family Services Administration (FSA), which falls beneath the Commission on Social Services (CSS). The CSS is one of three commissions within the DHS.

3. *LaShawn A. ex rel. Moore v. Kelly,* 990 F.2d 1319, 1326 (D.C.Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 691, 126 L.Ed.2d 659 (1994) (citation omitted).

Court ordered incorporated into the new Remedial Order.

Throughout this period of legal proceedings, the parties, Monitor, and Court continued with remedial efforts. As will be described below, on several occasions the plaintiffs and Court became discouraged with the progress of the defendants' compliance, and the plaintiffs twice moved for contempt. On October 4, 1994, when the defendants were utterly out of compliance with the Remedial Order and Revised Implementation Plan in the areas of Resource Development and Corrective Action, the Court entered an order imposing limited receiverships in those areas.[4] The October 4 order also adopted the parties' consent agreement for short timelines to meet other reform requirements in areas outside of those covered by the limited receiverships. Most of the elements of the consent agreement had been set forth in the Revised Implementation Plan, but the defendants had missed the deadlines and the plaintiffs agreed to extend them for selected tasks in an effort to avoid requesting further receiverships. The Court appointed the Receivers on November 23, 1994 and adopted their workplans on March 29, 1995.

Since the entry of the initial Remedial Order, the Center for the Study of Social Policy has acted as a court-appointed Monitor. The Monitor proposed detailed implementation plans for both remedial orders and regularly reports to the Court on the status of compliance with the Court's orders. The Monitor also assists the parties with negotiations when consent agreements are developed for the Court's consideration.

On April 4, 1995, the plaintiffs filed their third motion for contempt and also requested the imposition of a full receivership to cover all areas of the District's child welfare system. The Court now considers this motion.

## II. REMEDIAL HISTORY

The remedial phase of this case has been marked by repeated cycles of noncompliance and sluggish progress, frustration and requests for court intervention, promises to improve, and further noncompliance after a flurry of attempts to make short-term changes. This pattern has convinced the Court that the defendants either cannot or will not make the fundamental changes necessary to improve the plight of abused and neglected children.

The framework of the entire post-trial effort was the Remedial Order. This was not a set of restrictions that the Court unilaterally imposed upon the defendants. The parties developed its terms by consent and the then-mayor of the District of Columbia expressed her personal commitment to carrying out the plan. The Court entered the consent agreement as the Remedial Order.

On December 22, 1992, the plaintiffs filed their first contempt motion when the defendants were tardy in complying with a provision of the Remedial Order requiring that the District conduct a case review of all individuals in the child welfare system. However, once the motion was filed, the parties were able to agree that the defendants would immediately focus on five key areas— "building blocks"—which were necessary precursors to further reform. On April 30, 1993, the plaintiffs withdrew the contempt motion and stated that they were "gratified with the progress and the hard work" that the defendants had devoted to the building block areas. April 30, 1993 Tr. at 4. This was perhaps the high point in the District's compliance history.

On March 22, 1994, the plaintiffs filed their second contempt motion and supplemented it with a memorandum filed on July 21, 1994. The plaintiffs alleged noncompliance with nearly every section of the Remedial Order. This time, the plaintiffs requested that the Court appoint a receiver to solve all of the compliance problems. However, by the time they appeared before the Court on September 16, 1994, the parties had drafted a "consent agreement" stretching out the deadlines in many areas and the plaintiffs had agreed to hold in abeyance the request for a full receiver. Nonetheless, the plaintiffs main-

---

4. On November 23, 1994, the Court revised the order to include a limited receivership in the area of Protective Services.

tained that receiverships for Resource Development and Corrective Action were necessary, and repeated their request for a finding of contempt. September 16, 1994 Tr. at 1–12. The Court, not eager to engender resentment among the defendants and their employees, declined to grant the plaintiff's motion for a finding of contempt and held it in abeyance, even though "contempt may well [have been] justified." September 16, 1994 Tr. at 30. The Court therefore entered an order imposing the two limited receiverships and adopting the consent agreement on October 4, 1994.

By November 23, 1994, it was clear to the Court that the defendants would be unable to meet the consent agreement's deadlines with respect to Protective Services. Therefore, the Court imposed a third limited receivership in that area.

At this point, faced with increasing resistance on the part of the defendants, the Court was forced to begin issuing a series of piecemeal orders directing compliance with extant orders when it became apparent that the defendants had no plans to comply. *See* November 23, 1994 Order (requiring defendants to provide Monitor with copy of federal revenue maximization consultant's contract and establishing deadline for minor amendment of contract); November 23, 1994 Order (requiring defendants to formally adopt policies and procedures); February 16, 1995 Order (establishing deadline for defendants to issue management information system Request For Proposals).

By February 10, 1995, the newly appointed Receivers had informed the court that extremely basic resources were absent or in short supply, thus making it almost impossible for various sectors of the child welfare system to function. The Court therefore entered an order adopting the Receivers' Emergency Resource Plan to address these pressing needs. The plan required the provision of such essentials as diapers, copy paper, printed intake forms, automobile maintenance, telephones, and food vouchers.

Finally, on April 4, 1995, after learning that the Receivers were encountering resistance and hostility to their court-ordered efforts, and after compiling a 32–page list of over 130 areas in which they alleged the defendants had missed deadlines or were in noncompliance, the plaintiffs filed a third motion for contempt and again requested that the Court impose a full receivership. The motion has been fully briefed and was argued on May 15, 1995.

### III.  PRESENT VIOLATIONS: FINDINGS OF FACT

Various recent submissions from the parties, Monitor, and Receivers show that the defendants remain in noncompliance with many court-ordered requirements. It is important to note that most of these requirements, including those set forth in the Remedial Order and October 4, 1994 consent agreement, have been voluntarily proposed by the defendants. Instances of noncompliance are set forth below.

### A.  *Adoption*

Activity in this area has nearly ground to a halt, even though adoption provides welcome stability for children and an end to foster care expenses for the defendants. The Monitor reports that

> [a]doptions activity has now declined to levels that existed before the implementation of the ... Remedial Order. During [the first quarter of 1995] ... no children's adoptive placements were finalized by the Court.... A total of 151 children have been awaiting adoptive placement for more than 9 months, with 92 of these children expected to be adopted by their foster care parents. As of the end of the quarter, there were 104 adoptive homes studies that were incomplete after 150 days. These data are a cause for serious concern.... The Adoptions Branch has been operating without a permanent Chief since October, 1994 and there is a critical need to restore forceful leadership to this area.[5]

The plaintiffs express equally strong warnings about the state of adoptions activity. Because the defendants were totally inactive in pursuing an adoption for one of the named

---

5.  March 31, 1995 Quarterly Report at 8.

plaintiffs, the plaintiffs' counsel themselves performed many of the defendants' responsibilities in an attempt to move the process forward. Counsel had to exert "an enormous amount of pressure" on the defendants just to get the child's picture taken for the adoption search. When the defendants did not proceed, counsel, who are not experts in the adoption field, compiled a list of adoption agencies that could help with the search. Even after the defendants received the list, they said they were unable to reach the agencies. Plaintiffs' counsel then attempted to contact the agencies and succeeded. Finally, after this massive intervention by counsel into the defendants' professional sphere, the defendants signed a contract with an agency to assist with the search, but the plaintiffs remain unconvinced that the matter will proceed. April 7, 1995 Tr. at 8–9. It is therefore not surprising to learn that the defendants are out of compliance with many requirements in the adoptions area.

*1. Policies and Procedures.* The defendants were to have provided the necessary resources and implemented revised adoption policies and procedures by March 31, 1993. The deadline was then extended to September 30, 1993.[6] It was not until the Court ordered the defendants to adopt the policies and procedures on November 23, 1994 that this requirement was even halfway met. The defendants claim that they are in compliance with the revised policies and procedures,[7] but the Monitor disagrees.[8] It is impossible to conclude that the policies and procedures are being followed at the same time that adoptions activity has nearly halted and the plaintiffs are forced to provide their own suggestions for next steps.

*2. Adoptions Branch Staffing.* The Court required the defendants to fully staff the Adoptions Branch by June 30, 1992, and then extended the deadline to September 30, 1993.[9] The Monitor and defendants agree that as of April 16, 1995, nearly three years after the original deadline, the Branch still suffers from severe staffing shortages from top to bottom. The Adoptions Branch Chief position is not filled with a permanent employee, and at least five social workers, two clerks, and two social services assistants need to be hired.[10]

*3. TPR Staffing.* Corporation Counsel was to have committed the necessary personnel to assure timely termination of parental rights (TPR) by September 30, 1993.[11] Until this judicial procedure is completed, a child cannot be legally adopted. The defendants claim that they have completed this task because they hired a TPR Coordinator on March 9, 1995.[12] However, the Monitor notes that the defendants must still hire a legal assistant and full-time attorney.[13] Therefore, this task is not complete.

*4. Prompt Home Studies.* The Court ordered that all home studies conducted in preparation for adoption be completed within 150 days. The original deadline for this item was December 31, 1992, but it was extended to March 31, 1993.[14] More than two years after the extended deadline, the defendants admit that they are not in compliance.[15] The Monitor states that compliance is "not even close"—104 home studies were beyond the timeline as of March 31, 1995.[16]

*5. Monitoring and Improvement.* The Court ordered the defendants to monitor the progress of adoption activity, identify barriers, and develop the necessary corrective

6. Revised Implementation Plan at 74.

7. Defendants' Opposition to Contempt Motion, Exhibit I at 38.

8. March 31, 1995 Quarterly Report at 86.

9. Revised Implementation Plan at 76.

10. Defendants' Opposition to Contempt Motion, Exhibit I at 38–39; March 31, 1995 Quarterly Report at 86.

11. Revised Implementation Plan at 76.

12. Defendants' Opposition to Contempt Motion, Exhibit I at 40.

13. March 31, 1995 Quarterly Report at 86.

14. Remedial Order § VIII.F.1, Revised Implementation Plan at 77.

15. Defendants' Opposition to Contempt Motion, Exhibit I at 39–40.

16. March 31, 1995 Quarterly Report at 85.

action plans on a quarterly basis.[17] Because adoptions activity is proceeding so poorly, it is clear that compliance in this area is far from complete, and the Monitor so concludes.[18]

### B. Staffing

1. *Total Number of Social Workers.* The Court ordered the defendants to ensure the employment of 316 social workers by December 31, 1994.[19] The defendants report that only 290 social workers were in place as of April 18, 1995.[20] As the Monitor points out, the figures showing noncompliance here understate the actual shortage, since the present requirement was calculated based on the total number of children in the child welfare system in December 1993. In the meantime, the number of children in the system has increased and the total number of necessary social workers will rise accordingly.[21]

Serious problems can occur when staffing shortages lead to high caseloads. In its April 1991 opinion, the Court found that the extra responsibility made the social workers unable to

> initiate timely investigations, provide needed services, ensure appropriate placements, prepare case plans, visit with foster children and parents, recruit foster and adoptive families, monitor foster homes and institutions, and claim all federal funding to which the CFSD should be entitled.[22]

Though the defendants argue that they are close to the goal and therefore have achieved substantial compliance, several factors counterbalance this rosy interpretation. First, the deadline for full compliance is five months past. To be below the goal at this late stage does not inspire any confidence in future improvements. Second, the Monitor reports that for every two new social workers hired during the remedial phase of this case, one social worker has resigned.[23] This reveals the full measure of the challenge the defendants face in increasing their workforce. Third, the lag in compliance also suggests that the defendants will be unable to step up their efforts once the Monitor adjusts the goal to reflect the increased number of children in the system. Fourth, the Receivers report that social workers and other FSA staff were reported to be "leaving in droves" as a result of recent pay cuts, furloughs, and general disregard for worker concerns.[24] The defendants do not seem prepared for this potentially accelerating attrition, especially when considered in light of the extant retention problems.

2. *Administrative Supports.* The Monitor and defendants agree that the defendants are not in compliance with the court-ordered requirement that they develop and implement a plan to provide the required administrative supports to staff.[25] This requirement is reiterated in the Emergency Resources Plan adopted by the Court on February 10, 1995. The Monitor reports that even though many of the requirements of the Emergency Resources Plan were initially met,

> the Receivers and workers continue to report ongoing problems related to the availability of administrative supports (e.g., difficulty accessing supplies, forms, and vouchers for client services, lack of attention to basic office cleanliness and maintenance, lack of working word processors, phones that were once operable ceasing to work, and the ever-present problem of too few working automobiles). The response

---

17. Revised Implementation Plan at 76.

18. March 31, 1995 Quarterly Report at 87.

19. Remedial Order § XXII.B; Revised Implementation Plan at 93–95; October 4, 1994 Consent Agreement.

20. Defendants' Opposition to Contempt Motion, Exhibit I at 50.

21. March 31, 1995 Quarterly Report at 16.

22. 762 F.Supp. at 977.

23. March 31, 1995 Quarterly Report at 13.

24. Receivers' May 18, 1995 Report at 10. This "general disregard" includes the lack of basic administrative supports for the workers, as outlined below.

25. Revised Implementation Plan at 104–05; Defendants' Opposition to Contempt Motion, Exhibit I at 49, March 31, 1995 Quarterly Report at 23–24.

to the February 10 Court Order addressed the immediate crises and some systems were put in place to avert future crises of the same nature. However, the Receivers report that maintenance of equipment and lack of basic staff resources is an ongoing problem.[26]

The Receivers concur, and note that "[e]ach box of xerox paper secured for staff and each time a fax machine receives toner is a major victory," but that the cost of pursuing these basic resources is "high both in time and in steadily accumulating frustration."[27] This level of noncompliance is dismal. Without administrative supports that most professionals take for granted, the social workers cannot be expected to fulfill their most basic responsibilities, let alone take the extra steps needed to reform the present system.

*3. Other Staffing Requirements.* The defendants have failed to comply with numerous other staffing requirements. They were required to conduct an occupational study of social worker positions by June 30, 1992.[28] The deadline was extended to June 30, 1993, but as of April 18, 1995, the defendants could only state that a draft study had been completed and that a meeting had been scheduled for the next day to review the draft.[29] The Monitor reports also that "final plans for implementation of the new standard are proceeding at an extremely slow pace."[30] The defendants also state that they are in noncompliance with court-ordered requirements that they review and revise promotions policy, review employee performance every 6 months, and develop a caseload weighing formula.[31]

Furthermore, the defendants admit that they are not in compliance with requirements that all social workers have a current and valid license.[32] More importantly, they admit that over half of their supervisory units do not meet the required supervisor-to-staff ratio.[33] The Court required that this important standard be met by December 31, 1993.[34] When supervisors' caseloads are high, problems of overwork arise just as they do for line social workers. In its April 1991 opinion, the Court noted that "[b]y carrying heavy caseloads, the[ ] supervisors have been unable to train staff and to monitor cases to ensure the safety and well-being of the children for whom their staff is responsible."[35] As of March 31, 1995, over half of the 44 supervisory units had more than the required maximum of 5 social workers.[36] This is not even close to compliance.

## C. Training

The Monitor notes[37] and the defendants admit[38] that the defendants are in noncompliance with the court-ordered requirement that they develop and implement training for contract agencies focused on the needs of child-care and group home providers.[39] Though the original deadline of March 31, 1993 was extended to June 30, 1993, as of March 31, 1995, the defendants were only able to report that "planning meetings have

26. March 31, 1995 Quarterly Report at 23–24.

27. May 18, 1995 Receivers' Report at 2, 13.

28. Revised Implementation Plan at 103.

29. Defendants' Opposition to Contempt Motion, Exhibit I at 48.

30. March 31, 1995 Quarterly Report at 19.

31. Remedial Order §§ XII.B, XI.B; Revised Implementation Plan at 103, 106, 109; Defendants' Opposition to Contempt Motion, Exhibit I at 48–50.

32. Revised Implementation Plan at 107. The defendants argue that they have achieved substantial compliance because 90% of the social

workers do have a license. Defendants' Opposition to Contempt Motion, Exhibit I at 48.

33. Defendants' Opposition to Contempt Motion, Exhibit I at 49–50.

34. Remedial Order § XI.C; Revised Implementation Plan at 108.

35. 762 F.Supp. at 968.

36. March 31, 1995 Quarterly Report at 24.

37. *Id.* at 27.

38. Defendants' Opposition to Contempt Motion, Exhibit I at 54.

39. Revised Implementation Plan at 123.

occurred" and that they expected compliance by July 1995, more than two years late.[40]

### D. Management Information System

Federal law requires any child welfare agency receiving federal funds to maintain an information system from which the status, location, and goals for the placement of all foster care children may be readily determined. 42 U.S.C. § 627(a)(2)(A). In 1991, the Court observed that

> such a system is also mandated by reasonable professional standards and, this Court believes, by basic common sense. Defendants have admitted that [its current information system] is not adequate. [The system] cannot provide accurate information on the number of children in emergency care, how long they have been in that status, and when they are reaching the 90–day deadline for remaining in that status. [The system] is also unable to accurately identify the physical location of all of the children in foster care. Additionally, it does not contain accurate information concerning vacancies in foster homes, nor does it contain accurate information regarding which social workers are assigned to which children.

> \*　　\*　　\*　　\*　　\*　　\*

> Based on the foregoing, the Court finds that [the information system] is clearly inadequate for keeping track of the children in the District's foster care. The Court can only wonder how an agency that cannot track the location of the children in its custody can possibly comply with the remaining requirements of federal and District law, much less with reasonable professional standards.[41]

Unfortunately, this situation remains largely unremedied. Though incremental improvements in the present information system have been effected, the defendants have not moved promptly to replace the system with one that would be truly adequate. They were to have developed and implemented a new or fully revised management information system (MIS) to meet court-ordered requirements by December 31, 1994, but then the deadline was extended to December 31, 1995.[42] Upon discovering that the defendants did not appear to be on track to meet the December 1995 deadline, the Court adopted the Emergency Resource Plan on February 10, 1995, which required the District to release the Request for Proposals (RFP) for the MIS by February 28, 1995, and for a contract to be awarded by June 1, 1995. The Monitor notes, and the defendants do not disagree, that the defendants have "no chance of complying with the Court's June 1 date for signing a contract." [43] The Monitor bases this unfortunate conclusion on three facts: (1) the defendants changed the deadline for submitting responses to the RFP from April 17, 1995 to June 1, 1995, thereby making a contract award by June 1 impossible; [44] (2) the defendants submitted to the D.C. Department of Administrative Services 91 responses to vendors' inquiries about the RFP, but as of April 20, 1995, the Department of Administrative Services had not released these responses to the vendors, thereby making prompt bids unlikely; [45] and (3) the Monitor does not believe that the RFP conforms to the requirements of the U.S. Department of Health and Human Services' (HHS) requirement that the contract have a two-year implementation timeframe. If the RFP does not comply with HHS requirements, the defendants risk losing the 75% federal reimbursement which the defendants require in order to be able to afford the new system.[46]

### E. Administrative Review and Quality Assurance

1. *Administrative Review.* As noted in the Court's original liability opinion, federal

---

**40.** March 31, 1995 Quarterly Report at 27.

**41.** 762 F.Supp. at 976–77.

**42.** Revised Implementation Plan at 138–39.

**43.** March 31, 1995 Quarterly Report at 29.

**44.** *Id.* The defendants confirm that they made this change. Defendants' Opposition to Contempt Motion, Exhibit I at 63.

**45.** March 31, 1995 Quarterly Report at 29.

**46.** *Id.*

and District law both require that periodic reviews be conducted to determine the continued appropriateness of each child's placement.[47] 42 U.S.C. § 675(5)(B); D.C.Code Ann. § 16–2323(a). Obviously, this requirement prevents children from languishing in inappropriate situations as their circumstances change. The Court ordered the defendants to provide an administrative review for all children in care within 180 days of their entering the Department's physical and legal custody and every 180 days thereafter. The defendants were originally supposed to meet this standard by September 30, 1992, but the deadline was extended to June 30, 1993. Furthermore, by September 30, 1993, the defendants were to have eliminated the backlog of noncomplying cases.[48] The Monitor notes,[49] and the defendants agree,[50] that as of March 31, 1995, 180 cases were out of compliance with the requirements.

The defendants argue that they are in substantial compliance because they have achieved significant increases in the compliance percentage and in review timeliness since 1992.[51] However, the Monitor points out that the cancellation rate—the percentage of scheduled administrative reviews which were not performed—increased from 13 percent to 28 percent from the last quarter of 1994 to the first quarter of 1995.[52] The Monitor explains that this "sharp increase in cancellations" is attributable to the lack of case plans for children—in itself a problem—and staff furloughs.[53] The defendants themselves admit that of the 1432 administrative reviews scheduled for the first quarter of 1995, only 1038 were performed.[54]

Though the defendants have shown some improvement over the long term in this area, they remain drastically behind the September 30, 1993 and June 30, 1993 deadlines. Furthermore, the recent increase in cancellations suggests that progress may be slowing. Therefore, the Court cannot agree that the defendants are in substantial compliance.

*2. Quality Assurance.* The Monitor notes that the defendants responded to staff shortages by detailing Quality Assurance employees to administrative review functions. As a result, "[a]ll Quality Assurance activity has been curtailed since the last quarter of 1994" and "there has been virtually no progress in attaining the Quality Assurance goals outlined in the ... Implementation Plan." [55] This lack of progress is evident in the defendants' noncompliance in six separate areas outlined below.

The Court required the defendants to develop and implement a quality review process that will sample 20 percent of the cases in each supervisory unit every 12 months.[56] Though the defendants did develop a plan whose implementation began approximately eight months late, they have not proceeded with this review in any meaningful way in 1995.[57]

The Court also required the defendants to follow up on the above-described quality reviews by providing feedback to supervisory units and then developing corrective action plans for any problems.[58] The defendants state that they have provided feedback but have not yet completed any corrective action plans.[59] The Monitor points out that since

47. 762 F.Supp. at 974.

48. Revised Remedial Order at § X.B.1.c; Revised Implementation Plan at 145.

49. March 31, 1995 Quarterly Report at 34.

50. Defendants' Opposition to Contempt Motion, Exhibit I at 64 (lower table).

51. *Id.* at 63.

52. March 31, 1995 Quarterly Report at 33.

53. *Id.*

54. Defendants' Opposition to Contempt Motion, Exhibit I at 64 (upper table).

55. March 31, 1995 Quarterly Report at 31.

56. Remedial Order § X.C.3.a; Revised Implementation Plan at 150.

57. Defendants' Opposition to Contempt Motion, Exhibit I at 71; March 31, 1995 Quarterly Report at 31.

58. Remedial Order § X.C.6; Revised Implementation Plan at 150.

59. Defendants' Opposition to Contempt Motion, Exhibit I at 67.

the defendants have not proceeded with quality reviews in 1995, feedback and corrective action will not proceed either.[60]

The Court also required the defendants to assess the resources assigned to the Office of Administrative Review and develop a plan for increasing the review capacity of the office.[61] The defendants and the Monitor disagree over whether the defendants have achieved compliance in the area.[62] However, the Corrective Action Receiver agreed with the Monitor and found that further assessment and improvement was necessary.[63]

The defendants were also required to revise their staffing and resource plan for conducting administrative reviews. This revision was to be completed by September 30, 1992, but the deadline was extended to September 30, 1993.[64] Though the defendants again argue that they are in substantial compliance with this requirement,[65] the Court agrees with the Monitor[66] that the Corrective Action Receiver is correct to conclude that further work is needed in this area.

The Court also required the defendants to provide a response to workers within five days when administrative review unearths a policy issue requiring resolution. The defendants were to be in full compliance by June 30, 1992, but the deadline was extended for a year.[67] The Monitor concludes that the defendants are not in compliance and states that "feedback on policy issues is not occurring in a timely way."[68] The defendants agree that they are not in compliance with this standard.[69]

Finally, the Court required the defendants to implement changes to their recordkeeping practices when previous reviews reveal a need for adjustments. The defendants were to have completed this task by September 30, 1993, but the deadline was extended until December 31, 1993.[70] The defendants argue that they are in substantial compliance with this requirement because they have identified recordkeeping changes and implemented them. However, the defendants' own review of their recordkeeping practices yielded average scores between 2.58 and 3.86 on a five-point scale for various information fields.[71] The Monitor concludes that the identified changes in practice have not yet been implemented.[72]

## F. Licensing, Monitoring, and Contract Review

The defendants are in noncompliance with at least five court-ordered requirements in this area. First, the Court required the defendants to develop policies and procedures to enable prompt decisionmaking on the issuance of licenses for foster care facilities.[73] This move would enable the District to expand their foster care resources in an efficient yet careful manner in order to cope with the growing influx of children into the system. The policies and procedures were to have been developed by June 30, 1993, but the deadline was extended by a year. The Monitor and defendants agree that policies have been drafted, but still await the review of other District of Columbia offices, including the DHS General Counsel's Office, the Office of Corporation Counsel, and the Office

---

60. March 31, 1995 Quarterly Report at 32.

61. Revised Implementation Plan at 145.

62. Defendants' Opposition to Contempt Motion, Exhibit I at 68–69; March 31, 1995 Quarterly Report at 34.

63. Corrective Action Receivers' Workplan at 18–19, 28 (adopted by Court on March 29, 1995).

64. Revised Implementation Plan at 145.

65. Defendants' Opposition to Contempt Motion, Exhibit I at 68–69.

66. March 31, 1995 Quarterly Report at 35.

67. Revised Implementation Plan at 145.

68. March 31, 1995 Quarterly Report at 35.

69. Defendants' Opposition to Contempt Motion, Exhibit I at 72.

70. Revised Implementation Plan at 154.

71. Defendants' Opposition to Contempt Motion, Exhibit I at 70–71.

72. March 31, 1995 Quarterly Report at 35.

73. Remedial Order § XV.E.2.

of Regulatory and Legislative Affairs.[74] Obviously, the defendants are not on the verge of fulfilling this requirement even a year after the extended deadline.

Second, the Court required the defendants to implement changes to foster care licensing and program monitoring.[75] The defendants report compliance as incomplete [76] and the Monitor notes that while an interim Memorandum of Understanding is in place "no plan has been developed to assure that sufficient resources are available to make implementation of the agreement a reality." [77]

Third, the Court required the defendants to collect and compile information from program monitoring reviews. This compilation was to have been completed by December 31, 1992, but the deadline was extended fifteen months to March 31, 1994.[78] One year after the extended deadline, the Monitor reports noncompliance [79] and the defendants report that several steps remain before the task is completed.[80]

Fourth and fifth, the Court required the defendants to develop a plan for revision of contracting policies and procedures and to implement that plan so that the revisions were made. Revisions were to have been completed by December 31, 1992, but the deadline was extended until June 30, 1993.[81] The defendants admit that they have not yet formulated a plan for revision, let alone made the changes. However, they point out that *LaShawn* contracts are given expedited processing.[82] The Monitor states that the contracting process "remains cumbersome and it remains difficult to procure services in a timely fashion." [83] Based upon the defen-

dants' noncompliance in many other areas requiring various contracting measures, it is clear that the process is still a major hindrance.

## G. Legal Representation and Court Relationships

Because many of the children in the plaintiff class are involved in proceedings before the District of Columbia courts, the defendants must coordinate closely with various elements of the judicial system. Effective cooperation is especially important to complete the judicial termination of parental rights that is a prerequisite to adoption. With that in mind, the Court ordered the defendants to implement changes suggested by a formal assessment of legal services provided by the Office of Corporation Counsel, which is responsible for many of the family court matters, and the working relationships between DHS staff and Corporation Counsel staff. Full implementation was required by December 31, 1993.[84] However, the Monitor notes [85] and the defendants agree [86] that almost eighteen months after the deadline, the defendants have hired some new individuals but have not yet implemented the changes suggested by the assessment.

The Court also required the defendants to incorporate the training needs of the District of Columbia Superior Court into the defendants' Annual Training Plan. The defendants report some interactions between their agencies and the Superior Court, but do not state that they are in full compliance with

74. March 31, 1995 Quarterly Report at 46; Defendants' Opposition to Contempt Motion, Exhibit I at 73.

75. Revised Implementation Plan at 159–60.

76. Defendants' Opposition to Contempt Motion, Exhibit I at 75.

77. March 31, 1995 Quarterly Report at 45.

78. Revised Implementation Plan at 163–64.

79. March 31, 1995 Quarterly Report at 44.

80. Defendants' Opposition to Contempt Motion, Exhibit I at 75.

81. Remedial Order § XVI.B; Revised Implementation Plan at 165–66.

82. Defendants' Opposition to Contempt Motion, Exhibit I at 74–75.

83. March 31, 1995 Quarterly Report at 45.

84. Revised Implementation Plan at 170.

85. March 31, 1995 Quarterly Report at 46–47.

86. Defendants' Opposition to Contempt Motion, Exhibit I at 58–59.

this requirement.[87] The Monitor merely notes that compliance is incomplete.[88] Without more information, the Court cannot determine how soon the defendants will be in full compliance, but the September 30, 1993 deadline is already long past.

## H. Revenue Maximization

Revenue maximization is essential to many of the other court-ordered requirements: if the defendants do not receive their full share of federal funds for various child welfare operations, they will be unable to effect the sweeping changes required to lift the child welfare system out of its wretched state. It is incredible that the defendants have not pursued this avenue more aggressively, since it could provide them with an infusion of much-needed cash.

In the October 4, 1994 consent agreement, the defendants agreed to hire a full time employee to assure implementation of the revenue maximization plan embodied in the agreement and to comply with various provisions of the Remedial Order. The Monitor reports that "as an interim step," the defendants have designated two employees to work half-time on revenue maximization in cooperation with an outside consultant, but that "DHS has *not* taken steps to hire a full time employee.... [F]ailure to identify or hire a capable senior staff member could seriously delay work on revenue maximization."[89]

The Monitor's dire predictions have ample foundation. The defendants have been continually out of compliance with various elements of the revenue maximization plan as set forth in court orders. The defendants' reluctance to proceed was so great that on November 23, 1994, the Court had to issue an order requiring the defendants to take certain specific small steps toward the final approval of a contract for an outside consultant. Furthermore, the Monitor notes that the defendants have been uncooperative in working with the Monitor employee designated to assist the defendants with revenue maximization.[90]

## I. Services to Families and Children

1. *Interagency Access to Services.* By December 31, 1993, the defendants were to have developed specific plans that would improve interagency access to services. This deadline was extended from September 20, 1992.[91] Such cooperation is necessary in order to ensure that children in the plaintiff class have access to day care, health care, and other services provided by other parts of the District government. The defendants admit that compliance is incomplete in this area, even though they have developed protocols with some other District agencies.[92] The Monitor notes that "[f]iscal constraints in the District continue to make real access to services ... from other agencies of District government extremely problematic." For example, though the CSS signed a protocol with the Ambulatory Health Care Administration of the Commission on Public Health to provide priority clinic health care to FSA clients, the Commission on Public Health subsequently shut down several health care clinics, making the protocol much less useful.[93]

Not all of these problems have fiscal roots. The defendants appear incapable of managing the administrative tasks associated with providing available services. The documents before the Court reveal at least two examples of how these resources are wasted.

The first example concerns the use of day care services. When he received contradictory reports from social workers and FSA officials about whether day care was avail-

---

**87.** *Id.* at 58.

**88.** March 31, 1995 Quarterly Report at 47.

**89.** *Id.* at 56.

**90.** Plaintiffs' Motion for Contempt and Full Receivership (April 4, 1995), Exhibit C (letter from Monitor employee to defendants outlining barriers to progress in revenue maximization).

**91.** Revised Implementation Plan at 33.

**92.** Defendants' Opposition to Contempt Motion, Exhibit I at 13–14.

**93.** March 31, 1995 Quarterly Report at 68–69.

able, the Resource Development Receiver "was verbally assured that the cutback [in day care services] was an error which would be rescinded." However, when the Receiver requested confirmation that all staff were assured that day care was available, he did not receive an adequate response. On April 27, the Monitor (and not the Receiver) was provided with a copy of a memorandum dated April 3 from the FSA Administrator to all staff explaining that day care was available. The Receiver, notified by the Monitor, then contacted twenty supervisory units and found that "with few exceptions, the memorandum was not known to supervisors or made available to line staff."[94] The problem with this lack of communication is critical: if the social workers are not aware of the availability of day care, they will not be able to place children in foster homes requiring day care assistance, thereby exacerbating the shortage of placement resources.

The second example concerns the defendants' failure to use funded substance abuse treatment slots for which they had priority access. The plaintiffs supplied the Court with a memorandum from the District's Alcohol and Drug Abuse Services Administration to the Acting Administrator of FSA warning the recipient that CSS was in danger of losing its access to the slots because it had referred no individuals to the treatment program as of January 31, 1995.[95] This failure to act is inexcusable given that substance abuse is a major cause of child abuse and neglect, particularly when the defendants would have incurred no expense in utilizing the treatment.

*2. Family Service Fund.* The Court required the defendants to establish a family service fund upon which workers can draw to purchase goods or services required by a family that cannot be obtained in a reason-

able time period from another source.[96] Though the fund was to have been established by December 31, 1993, it still does not exist. The defendants admit that compliance is incomplete but state that they have arranged purchase orders with various organizations that provide the same goods and services sought to be paid for by the fund.[97] However, the Monitor notes that access to the resources "is spotty to nonexistent and/or services are very uneven. Staff have reported that while the Department continues to assure the presence of these resources, they can rarely find them to provide to clients."[98] The Receivers will work to address this problem through enforcement of the Emergency Resource Plan, but the defendants are presently far from compliance.

*3. Prompt Transfer of Cases to Service Workers.* The Court required the defendants to ensure the transfer of cases to service workers within five days, in order to expedite assistance to abused and neglected children.[99] Though this procedure was to have been in place by December 31, 1993 (and originally a year earlier), the defendants admit,[100] and the Monitor concurs,[101] that they have not yet implemented the plan they have developed for effecting this prompt transfer.

### J. Out-of-Home Care

The defendants are not in compliance with at least ten requirements in this area. First, and most essentially, the Court required the defendants to centralize placement activity in one placement office.[102] This was due to be completed by September 30, 1992, but the deadline was extended to August 30, 1993. The Monitor reports that placement is not centralized in the new office that the defendants have staffed. The Monitor explains that "placement workers still rely on person-

---

94. *Id.* at 9–10.

95. Plaintiffs' Motion for Contempt and Full Receivership, Exhibit B.

96. Revised Implementation Plan at 29.

97. Defendants' Opposition to Contempt Motion, Exhibit I at 14–15.

98. March 31, 1995 Quarterly Report at 70.

99. Remedial Order § VII.B.I and Revised Implementation Plan at 27 and 30.

100. Defendants' Opposition to Contempt Motion, Exhibit I at 15–16.

101. March 31, 1995 Quarterly Report at 71.

102. Revised Implementation Plan at 44.

al knowledge and relationships in making placements," and that the centralized office does not receive reliable listings of available placements. The Monitor also notes that

> [t]he lack of appropriate placements has reached crisis proportions with approximately 20 children for whom no placements are now available. The Placement Office staff are under extreme stress and are often forced to move children multiple times to a series of inappropriate placements.[103]

Second, the Monitor reports that the defendants are not in compliance with the Court's order to develop procedures and resources available to serve as a placement transition fund.[104] In fact, the Monitor states that the defendants have provided "[n]o new information" suggesting that any progress has been made.[105]

Third, the defendants are out of compliance with the Court's requirement that they hire a full-time employee to develop and coordinate supports for foster parents.[106] The Monitor points out that the DHS opposed adding this requirement to the Revised Implementation Plan.[107] The defendants note they have developed a required Foster Parent Handbook and convened a meeting of foster parents.[108] Though these steps are necessary and probably helpful to foster parents, they are too limited a substitute for the services of a full-time employee.

Fourth, the defendants have not achieved full compliance with licensing standards for the number of children in foster care homes, though they were required to do so by June 30, 1993 (the original deadline was three months earlier).[109] The Monitor and defendants do not report the same number of unlicensed homes, but this may be attributable to the difference in reporting dates.[110] Furthermore, the Monitor maintains that the existing data on the number of unlicensed homes is unreliable and the Corrective Action Receiver will verify the figures.[111] In any case, at least eleven homes with sixteen children are unlicensed even though the deadline passed almost two years ago.

Fifth, the Court required the defendants to increase foster parent payment rates to 100% of the 1992 USDA standards by April 1, 1994.[112] The defendants have not done so and have not provided any information to the Monitor on progress in this area.[113]

Sixth, the defendants have failed to implement a wide variety of support services for foster parents, even though the Court has imposed deadlines of March 31, 1993 and then September 30, 1993.[114] The defendants note that they have conducted a survey of foster parent needs and are currently providing some services, but that many plans are still in draft and compliance is incomplete.[115] The Monitor reports that existing support services have "been severely curtailed in recent months" that the present "widely dispersed efforts" would be more effective if a full-time employee were available to concentrate on the task.[116]

Seventh, the Monitor states that the defendants are not in compliance with certain sec-

---

103. March 31, 1995 Quarterly Report at 74. *See also* May 18, 1995 Receivers' Report, Attachment A (report detailing problems with successive emergency overnight placements).

104. Revised Implementation Plan at 47, 49.

105. March 31, 1995 Quarterly Report at 76.

106. Revised Implementation Plan at 52, 54; March 31, 1995 Quarterly Report at 76.

107. March 31, 1995 Quarterly Report at 76.

108. Defendants' Opposition to Contempt Motion, Exhibit I at 33.

109. Revised Implementation Plan at 46–47.

110. *See* March 31, 1995 Quarterly Report at 77 (38 unlicensed homes as of March 31, 1995); Defendants' Opposition to Contempt Motion, Exhibit I at 26–27 (11 unlicensed homes as of April 11, 1995).

111. March 31, 1995 Quarterly Report at 77.

112. Revised Implementation Plan at 55.

113. March 31, 1995 Quarterly Report at 77.

114. Revised Implementation Plan at 53, 55.

115. Defendants' Opposition to Contempt Motion, Exhibit I at 29–32.

116. March 31, 1995 Quarterly Report at 77–78.

tions of the Remedial Order regarding the case planning process and supervision of placements. The Court at first required this to be completed by March 31, 1994, but the date was extended to June 30, 1994.[117] Though the defendants point to some improvements in compliance, the Monitor "has not seen this change reflected in regular case reviews and administrative reviews ... nor in surveys of records reviewed in the course of fatality reviews." [118]

Eighth, the Court required the defendants to establish and fill a full-time position to coordinate kinship care. This was required to be completed by April 30, 1994.[119] The defendants and Monitor agree that a candidate has been selected but not yet hired.[120]

Ninth, the Court required the defendants to develop and implement policies and procedures for regarding the placement of children with kinship providers. Policies were to have been developed by March 31, 1994 and implemented by June 30, 1994.[121] Because the Court specifically ordered the defendants to adopt a full set of draft policies and procedures on November 23, 1994, the first part of this task is now complete. The Monitor reports that the policies were to be implemented beginning with staff training on April 24, 1995, almost one year late.

Tenth, the Court required the defendants to develop and implement a licensure process for kinship homes. This was required to be completed by December 31, 1992, but the deadline was extended by two years.[122] These policies were finalized by the Court order described above, but the Monitor reports that implementation is just beginning.[123]

## IV. PRACTICAL EFFECTS OF VIOLATIONS: FINDINGS OF FACT

Though the above review of the defendants' noncompliance mentions the practical effects of these problems, further illustration is in order. Three documents recently submitted to the Court show that the defendants' noncompliance can have devastating outcomes.

### A. Child Fatality

On February 4, 1995, a three-year old child was beaten and choked to death by a relative who was caring for the child. Because the deceased was known to the District's child welfare system, the Monitor reviewed the circumstances surrounding the fatality and prepared a Memorandum on April 4, 1995 which was forwarded to the parties and the Court.

The Monitor concluded that the death "could have been prevented" and that "no one adequately discharged a protective function" on behalf of the deceased or other children in the household. Though the defendants had received a report of neglect as early as October 1992, they missed "numerous clues, indications, and opportunities" to avoid this tragedy. April 4, 1995 Memo at 3.

The Monitor found that the defendants erred in several ways, including by not adequately assessing the child's risk at an early stage; not dealing appropriately with the child's mother; not performing regular visits; allowing the case to remain unassigned to any social worker for several periods of time; not providing adequate supervision and training for workers involved with the case; and not coordinating services provided by other parts of the District government. April 4, 1995 Memo at 3–5.

Furthermore, the Monitor concluded that the defendants' internal review of the fatality was "unsatisfactory on all accounts." The defendants failed to convene a timely review

117. Remedial Order §§ VII, IX; Revised Implementation Plan at 60.

118. Quarterly Report of March 31, 1995 at 78.

119. Revised Implementation Plan at 64.

120. Quarterly Report of March 31, 1995 at 80; Defendants' Opposition to Contempt Motion, Exhibit I at 33–34.

121. Revised Implementation Plan at 66.

122. Remedial Order § XV.F.1; Revised Implementation Plan at 64.

123. Quarterly Report of March 31, 1995 at 81.

panel; failed to involve the required high-level management in the review; failed to produce a report with sufficiently documented and detailed information; failed to produce the report promptly; and failed to address problems raised by the review. April 4, 1995 Memo at 6–7.

The widespread problems and inadequate internal response to this terrible event provide stark evidence that the defendants are unable or unwilling to comply with the Court's orders and alleviate the problems raised at trial. The Court cannot expect the defendants to respond to the more mundane but pressing matters involved in some of the remedial provisions (such as increasing staffing and making policy statements available) if they do not respond adequately to this clearly identifiable, highly publicized tragedy.

### B. Emergency Overnight Placements

Over the past several weeks, the Receivers have grown increasingly aware that children are being placed in a large number of successive temporary placements over short periods of time. The Resource Development Receiver investigated this issue and completed a report on May 18, 1995.

The report found that in April 1995, twenty-four children had multiple placements "driven by a drastic shortage of placement resources." One child experienced six different placements in two weeks. Other examples include a child moved three times in three days and another moved four times in four days. Report at 3–4. When children are shuttled around in this manner, many suffer. The children are traumatized and social workers are overburdened.

The Receiver identified several causes for this practice. In addition to the general shortage of placement resources, which must be addressed by systematic resource development, other problems worsen the situation:

—The computerized daily list of placement options is not accurate and makes placement difficult.

—Social workers are unsure whether day care is available when there is a chance to place a child in a home where day care is required.

—Foster parents and licensed vendors who can provide care are becoming reluctant to participate because they are not being paid and services have not been provided.

—Placement is not centralized and lacks "even basic computer support." Social workers must routinely make 25 phone calls to secure a placement.

—Few new foster care families have been approved in the last several months even though there have been numerous applicants.

Report at 3–7. The Receiver has identified short-term solutions for some of these problems and will proceed with the Resource Development Workplan in order to achieve long-term progress. However, the report buttresses the above evidence of systemic difficulty and shows how these problems can have harmful effects on children.

### C. Receivers' Report

On May 18, 1995, the Receivers submitted a joint report detailing the operation of the limited receiverships over the past few months. Though there are signs of progress, the Receivers also tell of epidemic inaction, resistance, frustration, and poor attitudes.

For example, the Protective Services Receiver states that children often remain overnight at the defendants' offices at 625 H Street N.E. The report tells of at least four children who slept at the facility in the month of May alone. The Receiver believes that "agency leadership does not demand the best from its staff," and that placements are not so difficult to find that children must remain in the offices. Report at 4–5. Foster parents also leave their children with the building's security guards during the day and this practice "is allowed and even condoned by some foster care workers who are desperate to keep homes, no matter how inadequate the foster parent may be." Report at 5. The Receiver concludes that

[o]ne of the goals of this Receiver was to point out problems which could provide the basis for moving to solutions. The District has refused most efforts to help and in some instances has actively worked against the Receivership. For this, I have no

choice but to support the concept of a General Receivership.

Report at 7–8.

The Corrective Action Receiver concurs and maintains "that there is such an atmosphere of passivity and even detachment within the FSA that it is difficult to see how client and service problems can be effectively addressed." Report at 8. The Receiver notes that it is difficult to retain workers because they are frustrated with pay cuts, furloughs, lack of basic administrative supports, and unclear pronouncements on the permanency of contract jobs. Report at 9–12. One social worker responded to a January 13, 1995 survey distributed by the Receivers thus: "I need 'an experienced capable supervisor. I have been here eight months. I am now the senior member of the unit. Since that time, three social workers, ones with the most experience, have left the unit. Please help. This is dangerous.' " Report at 16. A May 12, 1995 letter from a supervisor to the Receiver painted an equally pathetic picture:

> We sincerely appreciate your cooperation in helping us to expeditiously obtain toner for our printer. However, as I mentioned in our conversation, we ask that you continue in your endeavor to assist us in acquiring other much needed supplies and materials, i.e.: Telephone lines, space, supplies, standardized forms, typewriter, summer camp activities for children and training for parents.

Report at 16–17. Though the Receivers have graciously and valiantly risen to address the "severe level of dysfunction in the agency" that surprised even them, the Court did not appoint these three professionals with the idea that they would spend their time tracking down office supplies. It is apparent that the defendants will not act of their own accord to assist the limited receivers with reform.

The Resource Development Receiver, in addition to detailing the problems with successive emergency placements, notes that a "critically needed" respite care center donated by a third party remains unused because CFSD has not staffed it. After detailing various other problems reviewed above, the Receiver concludes from personal experience that "the environment is as dismal now as it was in the very beginnings of judicial intervention." Report at 13.

## V. SUMMARY OF FINDINGS OF FACT

As the above recital of woes demonstrates, the defendants are radically out of compliance with the Court's orders. The Court agrees with the Monitor's assessment of compliance in the areas discussed above and adopts each of the findings of facts proposed in Exhibit E to the plaintiffs' motion. The Court further finds that the problems in the District of Columbia's child welfare system are so widespread and persistent that the limited receiverships will not suffice to accomplish reform.

## VI. CONCLUSIONS OF LAW

### A. *Contempt*

■ Civil contempt does not have a punitive goal. It is "a remedial sanction designed to obtain compliance with a court order or to compensate for damage sustained as a result of noncompliance." *NLRB v. Blevins Popcorn Co.*, 659 F.2d 1173, 1184 (D.C.Cir.1981). Contempt is appropriate if clear and convincing evidence shows noncompliance, regardless of the intent of the contemnor. *Id.* at 1183 (citing *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 69 S.Ct. 497, 93 L.Ed. 599 (1949)).

■ *1. Good Faith.* The defendants argue that good faith and substantial compliance are defenses to contempt allegations. However, the cases they cite from this circuit precede *Blevins Popcorn* and thus do not control. *See Washington Metropolitan Area Transit Authority v. Amalgamated Transit Union*, 531 F.2d 617 (D.C.Cir.1976); *Brotherhood of Locomotive Firemen and Enginemen v. Bangor and Aroostook Railroad Co.*, 380 F.2d 570 (D.C.Cir.), *cert. denied*, 389 U.S. 327, 88 S.Ct. 437, 19 L.Ed.2d 560 (1967).

In any case, the defendant's good faith is arguable at best. The remedial history outlined above demonstrates that the defendants have repeatedly attempted last-minute ad-

justments or compromises in an attempt to avoid sanctions. Because this pattern has persistently recurred since 1991, the Court must question whether the defendants truly intend to cooperate in the remedial efforts. Additionally, the defendants' recent actions cast an extremely bad light on their alleged good intentions. On March 30, 1995, the Mayor transmitted a bill to the District of Columbia City Council that sought to abolish private rights of action to enforce local statutory responsibilities to care for and protect abused and neglected children. A copy of the transmittal memorandum and draft legislation have been docketed with the Clerk of the Court.

This legislative tactic damages the defendants' claims of good faith in two ways, regardless of whether they have a right to take such action. First of all, the proposal shows that the defendants seek to make child welfare "subordinate to the priorities which the Mayor, [Council, and Congress] establish through the appropriations process." Draft Legislation at 3. By abolishing the private right of action, the defendants intend to completely remove the Court from efforts taken on behalf of the children. With no means of outside enforcement,[124] and in the climate of the District's fiscal difficulties, there is absolutely no guarantee that the defendants will do anything at all to aid or protect their young residents. All legal accountability evaporates. The bill would allow the District to continue with impunity to ignore their legal as well as moral duty to care for these helpless children. The intended result of this legislation therefore casts doubt upon the defendants' present willingness to comply with either the letter or the spirit of the Court's orders, since there is no indication that the defendants consider child welfare important.

Second, the proposal suggests that the defendants have not been forthright with the Court about their desires to reach a negotiated solution with the plaintiffs. On April 7, 1995, the defendants told the Court that they had proposed an agency restructuring that "was undertaken with a great deal of thoughtfulness and care" and was "a worthwhile effort to address the very concerns that are foremost in the plaintiff and [M]onitors' mind, that is, infrastructure and leadership." April 7, 1995 Tr. at 17. This representation came just eight days after the defendants submitted the proposed legislation. It is quite hard to believe that the defendants could be diligently pursuing a negotiated solution at the same time that they were seeking to end the entire litigation of this case.

*2. Substantial Compliance.* Whether or not substantial compliance is a defense to contempt is irrelevant, for the defendants have not substantially complied with the Court's orders. As the detailed analysis above shows, the defendants are far from achieving reform in many key areas. The virtual stoppage of adoption activity, the critical staffing shortages, the dearth of basic administrative supports, the severely delayed installation of the MIS, and the inaction on revenue maximization highlight the degree of noncompliance. Illustrative situations such as the February 1995 fatality and the use of successive emergency placements reveal from another perspective how broad the failures are. Furthermore, the reports from the Receivers and the Monitor about the defendants' indifference counsel the Court to place no confidence in future efforts. The Resource Development Receiver's conclusion sums it up best: though the details of noncompliance and difficulty may be somewhat different from those brought forth at trial, the overall situation is just as "dismal" as it was in 1991, and abused and neglected children continue to suffer under these conditions.

Therefore, the Court holds that the defendants are in civil contempt of court for failing to comply with numerous provisions of the Court's orders. At this time, the Court will not impose any fines upon the defendants, and instead will take the measures outlined below.

### B. *Full Receivership*

The plaintiffs point out that the court's authority to order remedial injunctive relief

---

**124.** The transmittal memo presumes that no federal cause of action presently exists. This assumption is analyzed below, but is accepted *arguendo* here.

is broad. *Swann v. Charlotte–Mecklenburg Board of Education*, 402 U.S. 1, 15, 91 S.Ct. 1267, 1275–76, 28 L.Ed.2d 554 (1971). In addition to the venerable cases generated by the school desegregation movement, the plaintiffs cite other recent examples of receiverships imposed to remedy a variety of ills. *See, e.g. Shaw v. Allen*, 771 F.Supp. 760 (S.D.W.Va.1990) (prisons); *Glover v. Johnson*, 934 F.2d 703 (6th Cir.1991) (same); *United States v. Detroit*, 476 F.Supp. 512 (E.D.Mich.1979) (water-treatment plant); *and Perez v. Boston Housing Authority*, 379 Mass. 703, 400 N.E.2d 1231 (1980) (public housing).

■ The defendants make several arguments opposing the imposition of a full receivership. First, they state that the facts do not support the need for a full receivership because they have made and are continuing to make substantial progress. While it is true that the defendants have made some progress in various areas, the above factual findings show the urgent need for a new, more fundamental approach to change. Otherwise, each report of incremental progress will be mitigated by regression in another area or future inaction on that first step forward. Much of the progress originally made is now slipping back into the same tired way of doing business that brought these parties before the Court.

■ The defendants also assert that there is no legal basis for the receivership, since the second Remedial Order was entered on the basis of local law alone. The defendants attempt to argue that "there are no ... violations [of federal law] in this case," and that therefore the Court has no jurisdiction to intervene in local government matters. Defendants' Opposition to Contempt Motion

at 15. This characterization is at best disingenuous and could even be called patently untrue. The Court's April 1991 opinion found violations of both federal and local law. The Court of Appeals then directed that the Court reenter the remedial order on local law grounds *if possible*. The Court of Appeals did not require that the Court avoid relying on federal law where necessary.[125] The Court of Appeals also did not reach the merits of the Court's federal liability holding. To the extent that the defendants wish to argue that the Court must have a federal liability basis for its imposition of a full receivership, the Court will refer the defendants to its 1991 opinion.

The defendants also maintain that full receivership is inappropriate in light of Congress' recent creation of a control board to oversee the District's finances.[126] There is no reason to suppose that the control board and a full receivership in this case are mutually exclusive. The House of Representatives prepared a report on the legislation which contains several references to the various court-ordered obligations faced by the District[127] and even refers specifically to this case.[128] In fact, the legislation seems to anticipate coordination between court-ordered activities and the control board's oversight: the law gives the board power to make recommendations relating to the effects of court orders upon the operations of the District government. In some instances the board may take action upon its own recommendations, including "structural reforms, personnel actions, and the enactment of local ordinances."[129] As the defendants are well aware, the plaintiffs urge that a full receiver be empowered to take exactly these steps.

125. In fact, the Court of Appeals gave the Court particular instructions to consider the effect of *Suter v. Artist M.*, 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992) upon any finding of federal liability. Since the Court of Appeals' remand, however, the Supreme Court's decision has been at least partially overturned by congressional action. *See Jeanine B. ex rel. Blondis v. Thompson*, 877 F.Supp. 1268, 1281–1285 (E.D.Wisc.1995) (holding that recent statutory amendment reversed most effects of *Suter* and that federal cause of action existed to enforce many sections of Adoption Assistance Act.) The defendants

have not suggested that in spite of these developments, a federal cause of action no longer exists.

126. District of Columbia Financial Responsibility and Management Assistance Act of 1995, Pub.L. No. 104–8, 109 Stat. 97 (1995).

127. H.R.Rep. No. 96, 104th Cong., 1st Sess. (1995) at 5, 10, 12, 31.

128. *Id.* at 8–9.

129. *Id.* at 44.

The defendants also argue that the present Receivers be given more time to work before a full receivership is imposed. Because the Receivers themselves endorse the idea of a full receivership and because noncompliance is rampant in areas outside of the present Receivers' purview, this argument is unavailing. In fact, recent successes within the areas of receivership provide hope that change could occur elsewhere were a full receivership to be in place. For example, the diligent work and sometimes round-the-clock presence of the Protective Services Receiver has increased the promptness with which abuse and neglect investigations are initiated. In January 1995, only 69% of all investigations began within the required 48 hours. By the end of March, the figure had climbed to 81.4%.[130] Additionally, the quick development of the Emergency Resources Plan has provided some relief, although the Receivers must struggle with other District agencies in order to maintain compliance. Furthermore, the detailed and thoughtful workplans submitted by all three Receivers are a great improvement over the usual tardy and under-developed plans offered by the defendants at various stages of the remedial effort.

Finally, the defendants argue that they have proposed a viable restructuring plan that would improve the state of the child welfare system and obviate the need for a receivership. The Court has heard discussion of this plan at recent status calls, but remains unconvinced that the plan provides enough detail and enough overhaul to alleviate the problems set forth here. The plaintiffs, moreover, have engaged in extensive negotiations with the defendants in an attempt to agree upon a proposed restructuring, but brought this contempt motion when they left the discussions unsatisfied. While the Court is reluctant to dismiss any effort by the defendants to initiate real change, the substance of the plan, the plaintiff's reaction to it, and this case's history of last-minute attempted fixes leave the Court skeptical. Four years ago the Court was told that the defendants had a "plan" to rebuild the agency. Now, facing contempt and full receivership, the defendants again put forth a pro-

posed solution. There is no reason to believe this plan has more chance of success than the one the defendants presented at trial and quickly abandoned.

Therefore, the Court today imposes a full receivership over the child welfare system for the District of Columbia. As the accompanying order illustrates, the parties and Monitor shall attempt to agree upon the terms of a proposed order setting forth the steps necessary to effectuate this receivership. The parties have fully briefed the issue of the appropriate extent of the Receiver's powers, but the Court will defer resolution of this matter until after receipt of the proposed order. Obviously, the Receiver will have to be granted broad powers to effectuate the fundamental changes needed.

## VII. OTHER MATTERS

Also pending before the Court is the defendants' motion to reconsider the Court's adoption of the Resource Development Workplan submitted by the Receiver. The defendants argue that the workplan inappropriately requires them to prevent certain essential workers from receiving pay cuts or furloughs and requires the maintenance of funding for various items at certain levels.

For many of the reasons set forth above, the Court will deny the motion for reconsideration. In the various reports reviewed above, the Monitor and Receivers explain that pay cuts and furloughs have had severe effects on staff morale and retention, which have caused other areas of noncompliance to bloom. These problems are urgent and cannot await the uncertain future of further political action by the District. Neither the defendants' recent proposals nor past events in this case's remedial history suggest that there is any alternative solution to these staffing problems. It was therefore appropriate for the Court to exercise its broad remedial injunctive power and adopt the workplan. The Court will incorporate the above analysis and deny the motion for reconsideration. The motion to stay implementation of the workplan is denied as moot.

**130.** Defendants' Opposition to Contempt Motion, Exhibit I at 1–2.

## VIII. CONCLUSION

Today is a sad day for the District of Columbia and an even sadder day for the children of the District of Columbia. The defendants should be extremely uncomfortable with their present level of compliance and are undoubtedly disappointed to learn of the imposition of the receivership. The Court does not take these steps lightly. It has repeatedly expressed its reluctance to impose contempt sanctions[131] and to interfere in the operations of local government by imposing broad receiverships or issuing flurries of micromanaging orders.[132] The plaintiffs have also expressed their reluctance to seek a finding of contempt.[133] However, as the Court has warned the defendants with increasing frequency, it cannot tolerate widespread noncompliance with its orders. Notwithstanding the Court's warnings, outright hostility has replaced grudging acceptance. The pattern of delay and inaction that has characterized this case for the last few years must end now.

Abused and neglected children in the District of Columbia are not receiving the services and protection which are their desert and legal entitlement. The young child who was killed in February did not receive life-saving intervention. Boys and girls who must sleep in the defendants' office building do not receive the attention or resources necessary to provide them with a home for the night. Children who are shuttled from one emergency placement to another do not receive the continuity that their young psyches require. Perhaps most sadly of all, children awaiting adoption do not receive the expeditious help of the defendants in beginning a safer, more stable, and maybe even happier life.

At the time of the Cuban missile crisis, President John F. Kennedy noted that the Chinese character for crisis is a composite of two other characters meaning "danger" and "opportunity." The crisis now before the Court has just those elements. It is all too evident that the plaintiff children face great danger in the present system, and the Court intends for its ruling to provide the children and the defendants with the opportunity to begin again. Let us hope that the defendants respond to this opportunity.

---

131. *See, e.g.,* October 29, 1992 Tr. at 30 ("[The Court is] reluctant to move into a contempt mode or enforcement mode") *and* March 3, 1994 Tr. at 15 ("[Contempt can] be a distraction and a concern").

132. *See, e.g.,* February 26, 1991 Tr. at 68–69 ("It has traditionally not been the Courts' role in our society ... to impose themselves upon the Executive Branch"); July 30, 1992 Tr. at 26 ("I do not want to see this degenerate to a process of using the Court mechanisms of enforcement to compel the District to do certain things beyond what we've already found and agreed upon"); *Id.* at 32 ("I'm very loathe again to get into orders to compel the District and its various agencies to do specific things beyond the order we have"); August 5, 1992 Tr. at 25 ("I ... do not want either side running to me every time there's a disagreement and asking for the Court to intervene"); October 29, 1992 Tr. at 25 ("The Court does not want to get into micro-management of the agency.... That is not the Court's desire, and the proper role of a court is not to manage other branches of government, whether legislative or executive"); *Id.* at 30 ("[The Court is] reluctant to move into a contempt mode or enforcement mode"); January 28, 1994 Tr. at 10 ("I did not want to interfere with ... Executive operations"); August 12, 1994 Tr. at 45 ("[T]he court does not believe a court should be in running executive agencies. That's not the proper function of a court"); September 16, 1994 Tr. at 34–35 ("[The Court] does not ... believe that the Court should be appointing people to run agencies and to do their work"); November 18, 1994 Tr. at 40 ("I am leery of seeing the Court bit by bit eat away at the autonomy of the agency by expanding the receivers' authority"); *and* February 3, 1995 Tr. at 37 ("I think we're very close to doing something I have been reluctant to do.... I still fundamentally believe the courts should only be a last resort and should not interfere with the normal executive functions").

133. *See, e.g.,* January 29, 1993 Tr. at 9 ("[I]t is not our preference to litigate this case through contempt"); April 30, 1993 Tr. at 5 ("we're glad we're not talking contempt today"); *and* November 18, 1994 Tr. at 11 ("[W]hat we are proposing is a sanction that we are reluctant to propose").